Vincent A. CIRILLO, Appellant,

v.

ARCO CHEMICAL COMPANY, A DIVISION OF ATLANTIC RICHFIELD COMPANY and Ramey, Kermit C.

No. 88–1009.

United States Court of Appeals, Third Circuit.

Argued June 8, 1988.

Decided Dec. 1, 1988.

Paul D. Nelson (argued), Media, Pa., for appellant.

Jerome A. Hoffman (argued), Linda B. Dwoskin, Dechert Price & Rhoads, Philadelphia, Pa., for appellee Arco Chemical Co.

Robert E. Williams, Douglas S. McDowell, Ann Elizabeth Reesman, McGuinness & Williams, Washington, D.C., for the amicus curiae Equal Employment Advisory Council.

Steven S. Zaleznick, Christopher G. Mackaronis, Cathy Ventrell–Monsees, American Ass'n of Retired Persons, Washington, D.C., for amicus curiae American Ass'n of Retired Persons.

Before BECKER, STAPLETON, and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge.

In this case we are once again asked to consider whether an employee executed a valid waiver of his rights under the Age Discrimination in Employment Act, 29 U.S. C. § 621 et seq. ("ADEA"), when he signed a Release and covenant not to sue in exchange for an enhanced retirement package and special payment allowance. Under the principles announced by this court in *Coventry v. United States Steel Corporation*, 856 F.2d 514 (3d Cir.1988), we agree with the judgment of the district court that the waiver was knowing and voluntary and, accordingly, will affirm the grant of summary judgment in favor of the employer.

### I.

In 1986, Vincent Cirillo, the appellant, was one of approximately 700 employees released by Arco Chemical Company, the appellee, ostensibly as a result of a company-wide involuntary reduction in personnel. Cirillo, then 69 years of age, had worked for Arco for nearly 43 years. He was a managerial employee with a college degree and numerous graduate courses to his credit. As a part of its involuntary reduction in force and to limit litigation arising therefrom, Arco offered special cash payments based on length of service and salary to certain employees being terminated, including Cirillo. More specifically, Arco offered Cirillo a choice between two benefit packages, each with differing tax consequences: (1) an enhanced retirement lump sum payment of $297,351.96 which included $38,626.66 in excess of his normal retirement benefits, plus a one-time cash "Special Payment Allowance" of $45,624.96; (2) a normal retirement lump sum payment of $258,725.30, plus a one-time additional "Special Termination Allowance" of $91,249.92.

In order to explain these benefits to eligible employees, Arco held small group meetings detailing the various options, one of which Cirillo attended on September 10, 1986. At the meeting, Martin Halpin, an Arco employee relations consultant, distributed to each employee a package of documents including, *inter alia*, a cover letter listing all the documents enclosed, individually tailored benefits information, and special allowance materials. A number of the documents indicated that, as a condition of eligibility for any special allowance payment, an employee had to sign a general release (the "Release"). Reiterating what was stated in the documents, Halpin explained that the actual form containing the Release would be provided upon an employee's selection of a benefit option. Halpin told Cirillo at the meeting to review the materials in the package and to call him once he was ready to make a selection.

On September 26, 1986, Cirillo met with Halpin individually to indicate that he had chosen the Enhanced Retirement Package and the one-time Special Payment Allowance of $45,624.96. After filling out the requisite forms in accordance with Cirillo's choices, and after Cirillo signed the various forms, Halpin gave Cirillo the form containing the Release and told him to take it home and review it. The Release provided as follows:

Notice: Various State and Federal laws prohibit employment discrimination based on age, sex, race, color, national origin, religion, handicap or veteran status. These laws are enforced through the Equal Opportunity Employment Commission (EEOC), Department of Labor and State Human Rights Agencies. If you feel that your election of the Atlantic Richfield Special Payment Allowance was coerced and is discriminatory, you are encouraged to speak with your Employee Relations representative or follow the steps described in the Employee Problem Resolution procedure. You may also want to discuss the following release language with your lawyer. In any event, you should thoroughly review and understand the effect of the release before acting on it. Therefore, please take this Release home and consider it for at least (5) working days before you decide to sign it.

**General Release:**

**In consideration for the Special Payment Allowance under the Atlantic Richfield Special Termination Plan offered to me by the Company I release and discharge the Company, its successors, subsidiaries, employees, officers and directors (hereinafter referred to as "the Company") from all claims, liabilities, demands and causes of action known or unknown, fixed or contingent, which I may have or claim to have against the Company as a result of this termination, and do hereby covenant not to file a lawsuit to assert such claims. This includes but is not limited to claims arising under federal, state, or local laws prohibiting employment discrimination or claims growing out of any legal restrictions on the Company's rights to terminate its employees. This release does not have any effect on any claim I may have against the company unrelated to this termination.**

**I have carefully read and fully understand all the provisions of this Separation Agreement and General Release which sets forth the entire agreement between me and the company and I acknowledge that I have not relied upon any representation or statement, written or oral, not set forth in this document.**

App. at 152 (bold in original).

At both scheduled meetings, on September 10 and 26, as well as at several unscheduled encounters during the time he was contemplating whether to sign the Release, Cirillo expressed his concern to Halpin that he was being discriminated against on the basis of his age. Cirillo specifically mentioned to Halpin at these meetings that, according to a newspaper article he had read, a retirement plan offered by the DuPont Company ("DuPont plan") had recently been found by the Equal Employment Opportunity Commission ("EEOC") to discriminate against employees, like Cirillo, who were 65 years or older with at least 35 years of employment with the company; he wanted assurances that the Arco plan was not similarly flawed. Moreover, according to his subsequently filed complaint in this suit, Cirillo, from 1978 up to and including the time of his termination, had considered himself a victim of age discrimination and had voiced his concerns about this matter to his superiors. Nevertheless, despite his awareness of potential discrimination claims, Cirillo did not consult a lawyer about the matter and signed the Release approximately one month later on October 24, 1986. His official retirement date was on November 1, 1986.

On June 30, 1987, Cirillo instituted the present action against Arco in the district court. Cirillo complained, specifically, that he was fired because of his age in violation of the ADEA and that as a result of this termination, he was placed into a "special

involuntary retirement program" which had a disparate impact upon him. On October 30, 1987, Arco moved for summary judgment on the ground that, by signing the Release, Cirillo knowingly and voluntarily waived any ADEA claim arising from his termination. In response, Cirillo argued that the Release was deficient in a number of respects and therefore did not bar him from asserting his ADEA rights.

The district court granted summary judgment in favor of Arco, holding as a matter of law that Cirillo knowingly and voluntarily waived his ADEA rights when he signed the Release. The court relied primarily on two sources of authority for its decision: an unpublished memorandum opinion of this court, *Sullivan v. Boron Oil Co.*, 831 F.2d 288 (3rd Cir.1987), and a final rule, promulgated by the EEOC, providing for unsupervised ADEA waivers. *See* 29 C.F.R. § 1627 (eff. Sept. 28, 1987) (text *reprinted in*, 52 Fed.Reg. 32296 (August 27, 1987)). Two weeks after the district court entered its decision, however, Congress delayed the rule's effective date for at least one year. *See* 53 Fed.Reg. 3370 (Feb. 5, 1988).

In light of the decision recently reached by another panel of this court, in *Coventry v. United States Steel*, 856 F.2d 514 (3d Cir.1988), regarding the validity of unsupervised ADEA waivers generally, we need not address the propriety of the district court's problematic reliance on an unpublished opinion of this court, *see* Internal Operating Procedures, Court of Appeals, Third Circuit, Chapter 5, Para. A.2 (memorandum opinion has no precedential value), or discuss the current status of the EEOC's rule. Rather, we analyze this case in accordance with the reasoning in *Coventry*.

Our standard of review of a grant of summary judgment, , viewing the facts in the light most favorable to the party opposing the motion, is plenary. *Koshatka v. Philadelphia Newspapers, Inc.*, 762 F.2d 329, 333 (3rd Cir.1985).

## II.

In *Coventry*, a panel of this court declared that, "subject to a close evaluation of various factors that are indicia of 'knowing and willful' waiver, employees may execute valid waivers of their ADEA claims.".[1] 856 F.2d 518. In recognition of the important interests involved, the court declined to follow the stated rationale of several other federal courts of appeals which applied ordinary contract principles in deciding whether an ADEA waiver is enforceable. *See e.g., Lancaster v. Buerkle Buick Honda Co.*, 809 F.2d 539 (8th Cir.1987), *cert. denied,* —— U.S. ——, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987); *Runyan v. National Cash Register Corp.*, 787 F.2d 1039 (6th Cir.1986) (*en banc*), *cert. denied,* 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986). Rather, the court specifically adopted a "totality of the circumstances" approach, necessitating careful evaluation of the release form itself as well as the complete circumstances in which it was executed.

▌ As discussed in *Coventry* as well as in other cases addressing the issue, relevant factors in reviewing the totality of circumstances include, but are not limited to, the following considerations: (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether Plaintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law. 856 F.2d at 523; *see also e.g., Lancaster v. Buerkle Buick Honda Co.*, 809 F.2d 539 (8th Cir.1987), *cert. denied,*

---

1. The court explicitly rejected the claim, similarly advanced by Cirillo and the American Association of Retired Persons as *Amicus Curiae* in the instant case, that the Fair Labor Standards Act,

29 U.S.C. §§ 211(b), 216, 217 ("FLSA"), through incorporation into the ADEA, required that waivers must be supervised by the EEOC in order to be effective.

— U.S. ——, 107 S.Ct. 3212 (1987); *Pilon v. University of Minnesota*, 710 F.2d 466 (8th Cir.1983) (Title VII waivers). Our analysis of these factors in the circumstances surrounding Cirillo's Release leads us to agree with the judgment of the district court that Cirillo knowingly and voluntarily waived his ADEA rights by signing the Release contained in the Termination Agreement.[2]

Cirillo claims that the Release was understood by him to pertain only to claims based on the payment methods offered by Arco (*i.e.*, claims arising from the retirement options under the various Termination Plans), not an employee's selection by the company for termination generally (*i.e.*, claims arising from his discharge). He additionally argues that the Release was titled in a confusing manner, and that the document as a whole was contradictory because, on the one hand, the employee was asked to affirm that he or she "has not relied on any representation or statement, written or oral, not set forth in this document," while on the other hand, was to acknowledge that, "the special payment allowance under the company's special termination plan has been explained to me." App. at 152.

These arguments are unpersuasive. We find the text of the Release straightforward, clear, and specific. It releases all claims that an employee may have against the company "as a result of this termination" and specifically notes that it "does not have any effect on any claim ... unrelated to this termination." "Termination" in this context is not at all ambiguous. Moreover, the Release itself was presented to the employees in a manner and context that signalled the importance of the matter, explained the nature of the claims that would be released, and counseled mature consideration with the help of an attorney. As a result, we find the Release and its presentation well designed to communicate effectively the consequences of accepting a special allowance. Indeed, if the document provided to Cirillo were found to be an inadequate predicate for an effective waiver, we would be hard pressed to prescribe an adequate one.

Even if we accept that Cirillo in fact understood the Release as not addressing any claims arising from his firing, we must conclude that such a misguided subjective belief, without more, is insufficient to defeat summary judgment in the face of clear and unambiguous language. A contrary conclusion would undermine the utility of

**2.** Although the court in *Coventry* held that the plaintiff there had not knowingly and voluntarily signed the waiver in question, we note as a threshold matter that the primary factual circumstance giving rise to that conclusion is not present in the instant controversy. The termination plan at issue in *Coventry* required that the petitioner choose between either refusing to sign the waiver and facing an immediate cessation of income and hospital benefits for an indefinite period or waiving his ADEA rights and immediately receiving such benefits. Despite his unsupported assertions to the contrary, Cirillo was not in fact faced with such a "sign the waiver or starve" choice. The timetable devised by Arco ensured that, at no time subsequent to his termination, would Cirillo be without income; Cirillo's ordinary retirement benefits would have accrued on his official retirement date, November 1, when his severance pay period ended. Therefore, in contrast to the petitioner in *Coventry*, Cirillo's choice was whether to sign the release and receive *additional* compensation or not sign the release and receive his ordinary retirement benefits. *See discussion, infra*, at 455. Although Cirillo certainly faced economic pressure in the sense that

he was offered an economic incentive to release any claims he might have, it was neither of the degree nor kind of pressure affecting the voluntariness of the waiver considered in *Coventry*. Moreover, as Cirillo concedes, economic pressure alone is insufficient to establish a claim of duress that would void an otherwise valid release. *See e.g., Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885 (3rd Cir.1975). Rather, the rule followed by this court is that "one asserting duress must establish a wrongful act or threat which prevented a party from exercising his free will and judgment." *Plechner v. Widener College, Inc.*, 569 F.2d 1250, 1261 (3rd Cir.1977). Consistent with that precedent, the court in *Coventry* held that the waiver was executed under duress because it had been a product of a termination policy that contravened the ADEA. In the court's view, the employer's policy which denied severance benefits to all who were qualified for a retirement pension constituted "a wrongful act" sufficient to support a claim of duress. Thus, *Coventry's* economic dilemma was not the sole basis for the court's finding that the release was not voluntarily executed.

the voluntary settlement process. *See e.g., Pilon v. University of Minnesota,* 710 F.2d 466 (8th Cir.1983) (summary judgment upheld despite petitioner's subjective belief that unambiguous release did not bar certain Title VII claims).

Turning to the second and third factors listed above, we note that Cirillo is a literate, well-educated man and that he had an ample period of time to deliberate about signing the Release. The terminated employees, including Cirillo, were told that they could not sign the Release for at least five days and the record discloses that Cirillo took considerably longer to reflect upon the matter. Halpin testified that he informed employees during the September 10th general meeting and at all times subsequently when approached individually that they had up to one year following their termination to sign the Release and obtain the additional compensation. Consistent with that testimony, the materials given to Cirillo, introducing the Arco Special Termination Allowance Plan, contained the following description: "[t]he benefits of this Plan are available to employees not represented by a union, or employees represented by a union that has negotiated the benefits of this Plan, if: ... The employee executes a 'Separation Agreement' and 'General Release' *no later than one year* following termination of employment." App. at 141 (emphasis supplied).

It is undisputed that Cirillo in fact had the Release for approximately one month before signing it and that, during this time, Arco did not pressure him. When Cirillo indicated on a number of occasions that he was not ready to sign the Release, Halpin simply replied, "[f]ine, Vince, whenever you are [ready] call me." App. at 128. Indeed, Cirillo admits that, "he [Halpin] didn't coerce me into doing anything." App. at 49. Cirillo argues that he signed the form on October 26 because he believed it had to be signed by November 1, the official date of his retirement, in order that he receive the benefits. Yet, even if we accept Cirillo's representation that Arco did not make it clear that he had one year to sign the Release, we nevertheless agree with the district court that one month is a reasonable time for deliberation.

We also find that Cirillo fully understood that he had a right not to be discriminated against on the basis of his age. The notice provision preceding the Release clearly informed employees of their rights and of the manner in which they could enforce these rights. Cirillo acknowledged that he carefully reviewed the Release: "Q: [By defense counsel] What I'm saying is, you took it back home and you read it carefully? A: [By Cirillo] You have to, yes, okay." App. at 45–46.

Indeed, the record reveals that, not only was Cirillo generally cognizant of his right not to be discriminated against on account of his age, but he also was aware of the specific facts that he relies upon in this action as a basis for his ADEA claims. Cirillo testified, for example, that, although he believed the special allowance plan discriminated on the basis of age, he elected to sign the Release and accept the special allowance because he feared he could not prove his case:

> I think the third meeting I told Marty, 'I'm sorry to bother you so much but I'm going to give you a call one way or the other when I'm going to sign this thing,' and I repeated again that DuPont was bothering me. Finally, I decided 'What to hell? Do you want the money?' The answer is yes. Was he harassing me, coercing me—because I read something here about coercion ... He didn't coerce me into doing anything, but I felt maybe [Arco] was discriminatory and I couldn't prove that or show it. I had no way of knowing it. So I signed the release....

App. at 49. As that testimony reveals, and as Cirillo admits in his brief to this court, he clearly knew of the potential "DuPont claim" involving discrimination in the calculation of Arco's termination benefits. Moreover, in his original complaint filed in federal district court, Cirillo averred that his termination was only the latest in a series of discriminatory personnel actions of which he was painfully aware at the time:

> (G) Plaintiff was advised that his old age had a direct bearing on the adverse and derogatory comments contained in his performance reviews.

(H) Plaintiff's name was continually being mentioned as a candidate to be "fired."

. . . .

(J) In 1985 Plaintiff was threatened with a demotion in his job grade as a result of him refusing to enter into a voluntary retirement program that was then offered by Defendant ARCO. Plaintiff was told he was "too old" and that he should have voluntarily retired. He was advised that his complaints regarding age discrimination were causing a problem for the Supervisor and that this was going to adversely affect his up-coming pay raise.

(K) In 1986, Plaintiff was advised by a Supervisor that there was a Federal Law that required his retirement at age 70, even though the Supervisor knew that the company policy was "no mandatory retirement age." It was implicated to plaintiff by his Supervisor that he would be discharged at the earliest opportunity if Plaintiff failed to take voluntary retirement.

(L) Plaintiff was frequently advised from 1978 until 1986 by his Supervisor Defendant Ramey, that he should accept voluntary retirement as he was too old to fit in at Defendant ARCO.

App. at 9–10. These judicial admissions, as well as his deposition testimony, indicate that Cirillo, prior to signing the Release, had specific reason to believe he was in a position to assert both of the ADEA claims he now seeks to press.

Despite his concerns about signing the Release, and in the face of the language in the notice provision suggesting such assistance, Cirillo did not seek the advice of counsel. He relies upon the fact that his execution of the Release was uncounseled in support of his argument that he did not act knowingly and voluntary. We agree with the district court, however, that the more important consideration is whether consultation with a lawyer was encouraged, as it was in this case, rather than whether the plaintiff in fact received the benefit of counsel. While lack of professional counseling may be a relevant consideration even in a situation where it has been encouraged by the employer, an employee can not be required to hire a lawyer before signing a waiver and it should normally suffice for the employer to suggest that the employee may wish to consult an attorney.[3]

A final factor provides support for the finding of the district court that Cirillo executed a knowing and voluntary waiver.[4] The special allowance given to Cirillo and accepted by him in exchange for his Release exceeded the employee benefits to which he was already entitled by $84,-251.62. Accordingly, we find unpersuasive Cirillo's argument that his waiver was unsupported by consideration and thus not enforceable. The record is clear that unless Cirillo signed the Release, he would not receive the additional money, but that

---

**3.** Our reasoning is consistent with *Coventry.* Unlike Arco in the instant case, United States Steel, the employer in *Coventry,* did not suggest either verbally or in writing that an employee consult with a lawyer. Therefore, the court in *Coventry* properly considered the absence of legal counsel as an additional factor undermining a finding that the waiver was signed knowingly and voluntarily.

**4.** In *Coventry,* we noted that the existence of an opportunity to negotiate with respect to a release is a substantial indicia that its execution was knowing and voluntary. While the absence of such an opportunity is not as strong an indicia that a release is unknowing or involuntary, to the extent such absence and other evidence suggest that the atmosphere surrounding the execution was oppressive, it is, of course, a relevant consideration. Here, there is no indication that Cirillo was afforded an opportunity to negotiate concerning the terms of the special allowances or the Release. The record does indicate, however, that Cirillo did not perceive himself as being completely at the mercy of an intractable employer. After being informed of his involuntary termination, Cirillo tried to extend his length of service by a few months which would have effectively enlarged the consideration he would have received under either termination plan. Although he was unsuccessful, he recognized in his complaint that such extensions had been granted to others in his situation. As such, while Cirillo was unable to increase the benefit package he received, he clearly perceived the channels for negotiation open and in fact availed himself of them in an effort to stay his date of termination.

his ordinary retirement benefits would be unaffected by whether he signed the Release. Cirillo's testimony reflects that understanding:

> We—Marty set up this meeting for September 26 ... and Marty said that, "You understand that your retirement date is November 1." And I said "Yes, I know that." And he said, "Okay, then we will get on with the release." And he proceeded to fill this top part of it out. And he arrived at *this $45,600* there. And then he said, "In order for you to get *this* money, you have to sign this release and you have to sign it before November 1," my retirement date, so I said "okay".

App. at 41–42 (emphasis supplied).

### III.

In sum, we conclude that all of the relevant factors to which we have been referred by the parties support the conclusion that Cirillo's release of his ADEA claims was knowing and voluntary. We find nothing that tends to support a contrary conclusion. Accordingly, applying the "totality of circumstances" test endorsed by this court in *Coventry*, we hold that the Release was effective to extinguish the claims asserted in this suit. We will affirm the summary judgment in Arco's favor.