**John DIBIASE**

v.

**SMITHKLINE BEECHAM CORP.**

Civ. A. No. 93–3171.

United States District Court,
E.D. Pennsylvania.

March 15, 1994.

342

Richard A. Ash, Lyman and Ash, Philadelphia, PA, for John Dibiase.

Alan D. Berkowitz, Dechert, Price & Rhoads, Susannah R. Goodman, Philadelphia, PA, for Smithkline Beecham Corp.

Francis M. Milone, Morgan, Lewis & Bockius, Philadelphia, PA, Ann Elizabeth Reesman, Douglas S. McDowell, McGuiness and Williams, Washington, DC, for Equal Employment Advisory Council.

Alice W. Ballard, Samuel & Ballard, P.C., Philadelphia, PA, Cathy Ventrell–Monsees, American Ass'n of Retired Persons, Washington, DC, for American Ass'n of Retired Persons.

Jonathan M. Stein, Community Legal Services, Inc., Philadelphia, PA, for Action Alliance of Senior Citizens of Greater Philadelphia.

Jonathan A. Weiss, Legal Services for the Elderly, New York City, for Elderly of New York City.

## OPINION

PADOVA, District Judge.

This case involves allegations of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C.A. § 621–634 (West 1985 & Supp. 1993). Plaintiff's amended complaint asserts two claims: Count I avers that defendant, SmithKline Beecham Corporation ("Smith-Kline"), discriminated based on age when it terminated Plaintiff's employment; Count II asserts that a waiver provision in Smith-Kline's separation benefit package violates ADEA. SmithKline filed this motion for summary judgment on both Counts of Plaintiff's amended complaint.[1] For the reasons set forth below, I shall grant SmithKline's motion with respect to Count I, but I shall deny summary judgment with respect to Count II.

## I. BACKGROUND

SmithKline is a corporation that manufactures and markets pharmaceutical and consumer products, and was formed in 1989 as a result of a merger between SmithKline Beckman Corporation and Beecham Pharmaceuticals. Following the merger, SmithKline operated computer data centers at King of Prussia, Philadelphia, and Pittsburgh, Pennsylvania, and at Bristol, Tennessee.

During 1990, SmithKline consolidated the four separate data centers into a single center located at King of Prussia. Before consolidation, Plaintiff was employed as the first shift supervisor at the Philadelphia data center.[2] After consolidation, six shift supervisors worked at the King of Prussia data center, two supervisors per shift, with each pair of supervisors overseeing the work of only 3–5 computer operators. Michael Oleksiuk, who had been manager of the Philadelphia data center, was transferred to the consolidated facility and became Manager of Data Center Operations, and the immediate superior of the six shift supervisors. In August 1991, after Geraghty transferred to an operations analyst position, five shift supervisors remained at the King of Prussia facility.

In December 1991, Katherine Holland, formerly the Director of Business Systems and Operations, assumed overall responsibility for the consolidated data center. Holland determined that only one shift supervisor was needed per shift, and decided in January 1992 to terminate two of the five remaining shift supervisors. Holland met with Oleksiuk and Tyrone Barber, the data center's personnel manager, to determine who should be laid off. Barber prepared an "adverse impact analysis" examining the gender, race, and age of the shift supervisors to determine if any adverse impact would result from the planned reduction in staff. On February 1, 1992, Holland met with Oleksiuk, Barber, and William Mossett, SmithKline's Vice President and Director of Corporate Personnel, and determined that Plaintiff and Fleming should be laid off. On February 2, 1992, Oleksiuk informed Plaintiff that his employment was terminated. At that time, Plaintiff was fifty-one years old.

As a terminated employee, Plaintiff was eligible for SmithKline's separation benefit plan ("the Plan"). The Plan included a lump sum payment based on length of service and three months continued health and dental benefits. The Plan also offered enhanced benefits to terminated employees who signed a general release of all claims against SmithKline. The enhanced benefits included a larger lump sum payment and six months continued health and dental coverage. Under the Plan, Plaintiff was entitled to a lump sum payment equal to fifteen months salary if he signed the release, or twelve months salary if he declined to sign the release. Plaintiff did not sign the general release.

Count I of Plaintiff's amended complaint asserts that SmithKline's decision to terminate Plaintiff's employment was part of a corporate plan to eliminate older workers

---

**1.** On December 16, 1993, Plaintiff filed Civil Action No. 93–6802 alleging a retaliation claim. On December 22, 1993, I ordered the two cases consolidated. Civil Action No. 93–6802 was then closed, and that complaint is now part of this action. This motion for summary judgment, filed on December 20, 1993, does not address Plaintiff's retaliation claim, and I therefore will treat this motion as one for partial summary judgment.

**2.** The other two shift supervisors at the Philadelphia data center were Alexander Fleming (second shift), and Michael Geraghty (third shift). The supervisors at the King of Prussia data center were Charles King (first shift), Fidel Santos (second shift), and James Denton (third shift). They remained in their respective shifts following consolidation.

from the corporation's payroll. Count II asserts that SmithKline's separation benefit plan violates ADEA because older workers must release more claims than younger workers to receive the same enhanced benefits.[3]

## II. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

An issue is "genuine" only if there is sufficient evidence with which a reasonable jury could find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Furthermore, bearing in mind that all uncertainties are to be resolved in favor of the nonmoving party, a factual dispute is only "material" if it might affect the outcome of the case. *See id.* at 248, 106 S.Ct. at 2510.

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

## III. DISCUSSION

SmithKline seeks summary judgment on both counts of Plaintiff's amended complaint. I shall address each count separately.

### A. Plaintiff's Termination

ADEA makes it unlawful for an employer "to discharge any individual ... because of such individual's age." 29 U.S.C.A. § 623(a)(1). In the absence of direct evidence, the plaintiff must first prove a *prima facie* case of age discrimination. *See Billet v. CIGNA Corp.,* 940 F.2d 812, 816 (3d Cir.1991); *cf. Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985). If the plaintiff establishes her *prima facie* case, a presumption of unlawful discrimination arises. *Texas Dept. of Commun. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The burden of production then shifts to the defendant to rebut the presumption of discrimination by articulating legitimate, non-discriminatory reasons for the plaintiff's discharge. *Id.* If the defendant meets this burden of production, the presumption of unlawful discrimination "simply drops out of the picture." *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *see also Reiff v. Philadelphia County Court of Common Pleas,* 827 F.Supp. 319 (E.D.Pa. 1993) (applying *Hicks* to summary judgment analysis of age discrimination claim under ADEA). At that stage, the plaintiff, who always bears the burden of persuasion on the ultimate question of whether there has been discrimination, is not required to offer any additional proof of discrimination, but must present evidence refuting the defendant's articulated non-discriminatory reasons. *Hicks,* —— U.S. at ——, 113 S.Ct. at 2749, 2756.[4]

---

**3.** ADEA provides a cause of action for age discrimination only for persons at least 40 years of age. 29 U.S.C.A. § 631(a) (West 1985 & Supp. 1993). Plaintiff alleges, therefore, that employees age 40 and older must waive more claims,

namely age discrimination, to receive the same enhanced benefits as employees under age 40.

**4.** To satisfy her ultimate burden of persuasion, the plaintiff must prove *"both* that the [defendant's] reason was false, *and* that discrimination

Summary judgment for the employer is appropriate, therefore, if the plaintiff fails to make a factual showing sufficient to 1) establish her *prima facie* case; or 2) refute the defendant's articulated non-discriminatory reasons. SmithKline asserts that Plaintiff cannot establish his *prima facie* case, and that even if he could establish a *prima facie* case, Plaintiff has not offered evidence refuting SmithKline's proffered nondiscriminatory reasons.

 A plaintiff may establish her *prima facie* case of age discrimination by proving that she "(1) belongs to a protected class; (2) was qualified for the position; (3) was dismissed despite being qualified; and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination." *Billet,* 940 F.2d at 816 n. 3.[5] SmithKline does not dispute that Plaintiff belongs to the protected class, that he was qualified for the position, or that he was dismissed despite being qualified. SmithKline argues, however, that Plaintiff was not replaced. Plaintiff replies that he was replaced by Geraghty, an individual almost twenty years his junior. Plaintiff faces an arduous task, however, because he was not directly replaced by Geraghty. Instead, Plaintiff avers that SmithKline indirectly replaced him with Geraghty to conceal any hint of age discrimination.

To support his replacement "theory," Plaintiff offers details of five separate events occurring over approximately thirteen months. First, in December 1991, Oleksiuk and Holland discussed whether Geraghty might return as a shift supervisor. Oleksiuk Aff. ¶ 7. Second, at the same approximate time period, Barber included Geraghty's name on the Adverse Impact Analysis, even though Geraghty had transferred to an operations analyst position approximately four months earlier. App. at 1422. Third, Holland retained Denton and terminated Plaintiff, even though Oleksiuk ranked Denton lower than Plaintiff in terms of performance. Holland Dep. at 177–79; Oleksiuk Aff. ¶ 4. Plaintiff asserts, with no evidentiary support, that Holland retained Denton specifically so that she could later "dispose of" him at any time due to his supposed incompetence. Pl.'s Reply Opp'n Def.'s Mot.Summ. J. at 21. Fourth, in late October 1992, approximately nine months after Plaintiff was terminated, Holland terminated Denton because of poor performance.[6] Oleksiuk Aff. ¶ 10. Fifth, in January 1993, almost one year after Plaintiff was terminated, and two months after Denton was terminated, Geraghty was asked to return as a shift supervisor to replace Denton. Geraghty Dep. at 73.

Plaintiff's replacement theory fails for two independent reasons. First, because of the extended delay between Plaintiff's termination and Geraghty's return as a shift supervisor, there is an absence of evidence that Plaintiff was replaced. *See, e.g., Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1422 (9th Cir.1990) (claim of replacement by a younger worker is substantially weakened when the replacement did not occur until six or seven months after plaintiff's discharge); *Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 941 (6th Cir.1987) (replacement claim questionable when replacement occurred three months after plaintiff's discharge). Additionally, Plaintiff has not offered facts showing that

---

was the real reason." *Hicks,* —— U.S. at ——, 113 S.Ct. at 2752. "The factfinder's disbelief of the reasons put forward by the defendant … may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Id.* at ——, 113 S.Ct. at 2749. Once the employer meets its burden of production, therefore, the plaintiff *may not simply rest her case.* Although she need not present any additional proof of *discrimination,* the plaintiff must introduce evidence refuting the employer's reasons; otherwise, the factfinder has no evidentiary basis upon which to reject the reasons.

**5.** Where the plaintiff's job is eliminated and she is not replaced, the plaintiff may establish her *prima facie* case by showing that she is in the protected class and was qualified for the job from which she was laid off, while other workers *not* in the protected class were retained. *See Billet,* 940 F.2d at 816 n. 3. Plaintiff in this case cannot make such a showing, however, because all three retained employees, King (age 46), Santos (age 51), and Denton (age 49), were within the protected class when Plaintiff was terminated. App. at 1422.

**6.** Denton's termination was effective November 3, 1992. App. at 1486.

the shift supervisor position requires specialized knowledge or that the position normally goes unfilled for long periods of time, such that Geraghty's return almost one year after Plaintiff's termination might possibly be considered a replacement. *See Powell v. Syracuse University*, 580 F.2d 1150, 1156 (2d Cir.) (in the context of university employment, gap of two years between the non-renewal of a teaching contract and the hiring of a new teacher does not preclude a finding of "replacement," where teaching post requires specialized skills, hiring is very sporadic, and such positions normally are not quickly filled), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978); *Nordquist v. Uddeholm Corp.*, 615 F.Supp. 1191, 1199 (D.Conn.1985) (six month time lag between plaintiff's discharge and defendant's advertisement of an open position does not preclude finding of replacement because the position required specialized knowledge and hiring decisions for such positions were made infrequently).

Second, because Plaintiff's theory is internally inconsistent, there is no genuine issue that Plaintiff was replaced. Initially, Plaintiff argues that Holland could not have based her decisions solely on performance because Denton "was not competent and had serious problems carrying out his third shift duties including sleeping during his shift." Pl.'s Reply Opp'n Def.'s Mot. Summ. J. at 14.[7] Additionally, Plaintiff avers that Holland "re-

alized that Mr. Denton could be disposed of at any time because of his serious employment inadequacies." *Id.* at 21. Later, however, Plaintiff contends that Denton was competent, and that Holland wrongfully terminated Denton in October 1992 simply to replace him with the much younger Geraghty. *Id.*; Oleksiuk Aff. ¶¶ 9–10. Thus, Plaintiff's replacement theory requires belief that Denton was so incompetent in February 1992 that Holland's decision to retain him and terminate Plaintiff was a pretext for later age discrimination, but also that Denton was sufficiently competent in October 1992 that Holland's decision to terminate Denton was a "setup," unjustified, and solely based on age bias. No jury reasonably could conclude from this inconsistent evidence that SmithKline replaced Plaintiff with Geraghty.[8]

Because Plaintiff has failed to offer facts sufficient to establish that he was replaced, and because no jury reasonably could conclude from the facts that Plaintiff has offered that he had been replaced by Geraghty, SmithKline is entitled to summary judgment on Count I of Plaintiff's amended complaint.[9]

## B. SmithKline's Separation Benefit Plan

■ As part of its separation benefit plan, SmithKline offered enhanced severance benefits [10] to terminated employees who signed a general release of all claims against Smith-Kline.[11] SmithKline asserts that the Plan

---

**7.** As further support, Plaintiff asserts that Oleksiuk "wanted to reduce force by terminating Alex Fleming and James Denton because of their level of competence." Pl.'s Reply Opp'n Def.'s Mot. Summ. J. at 16. Additionally, Plaintiff asserts that Fleming and Denton were the obvious selections [for termination] because of their known lack of competence." *Id.* at 20.

**8.** Further, the part of Plaintiff's argument asserting that Denton was incompetent requires belief that Holland was willing to tolerate retaining a known incompetent person as the *sole* third shift supervisor *for nine months* in order to discriminate against Plaintiff based on age. This scenario is highly unlikely, and undercuts Plaintiff's argument that he was replaced by Geraghty.

**9.** I note that the Court of Appeals for the Third Circuit has stated that "[b]ecause the prima facie case is easily made out, it is rarely the focus of the ultimate disagreement." *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 523 (3d Cir.1992), *cert. denied*, — U.S. ——, 114

S.Ct. 88, 126 L.Ed.2d 56 (1993). Moreover, a district court should not normally conclude that the plaintiff has failed to establish her prima facie case where the parties dispute the *subjective* issue of the plaintiff's qualification for the position. *Id.* However, where, as here, the plaintiff fails to establish an *objective* element, such as replacement, he has failed to establish an essential element of his *prima facie* case.

Because Plaintiff has failed to establish his *prima facie* case, I need not decide whether he has offered evidence refuting SmithKline's articulated non-discriminatory reasons for Plaintiff's termination.

**10.** Employees with equivalent lengths of employment received the same enhanced benefits.

**11.** The general release provided in pertinent part that in exchange for consideration received, the employee waived, among other things:

Any and all claims arising under federal, state or local constitutions, laws, rules or regula-

does not violate ADEA, and that Plaintiff's claim fails under both the disparate treatment and disparate impact theories of employment discrimination. I shall address these issues in turn.[12]

Disparate treatment discrimination exists where "[t]he employer ... treats some people less favorably than others because of their race, color, religion [or other protected characteristics.] Proof of discriminatory motive is critical, although in some situations it can be inferred from the mere fact of differences in treatment." *Hazen Paper Co. v. Biggins*, —— U.S. ——, ——, 113 S.Ct. 1701, 1705, 123 L.Ed.2d 338 (1993). If the challenged employment policy is facially discriminatory, no further proof of intent is necessary. *See U.A.W. v. Johnson Controls, Inc.*, 499 U.S. 187, 198–200, 111 S.Ct. 1196, 1203–04, 113 L.Ed.2d 158 (1991).

SmithKline's separation benefit policy constitutes disparate treatment because it facially discriminates based on age. By its express terms, SmithKline's Plan conditions enhanced benefits on the waiver of any and all claims arising under ADEA. Because ADEA provides a cause of action for age discrimination only to persons age forty and above, the Plan explicitly treats older employees differently than younger employees. An employment policy explicitly mandating different treatment of persons within the protected class facially discriminates. *See, e.g., Thurston*, 469 U.S. at 121, 105 S.Ct. at 622. As the Supreme Court has noted, "[w]hether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination." *Johnson Controls*, 499 U.S. at 199, 111 S.Ct. at 1204.

SmithKline argues, however, that the Plan does not facially discriminate because all employees are required to release all claims to receive enhanced benefits. SmithKline is incorrect. In order for an older employee to receive the same enhanced benefit as a younger employee, the older employee must release her right to file an ADEA claim. This treatment is patently different because the younger employee cannot have an ADEA claim. Moreover, this difference in treatment is solely related to age.

Furthermore, the Plan discriminates against individual older employees. ADEA makes it unlawful to "discriminate against any *individual* with respect to [her] compensation, terms, conditions, or privileges of employment, because of such *individual's* age." § 623(a)(1) (West 1985) (emphasis added). The statute focuses on individuals, and precludes treatment of individuals as simply components of an age-based class. In this regard, *Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) is highly instructive.

The Los Angeles Department of Water and Power administered its own retirement, disability, and death benefit programs for its employees. *Id.* at 702–05, 98 S.Ct. at 1373. The monthly retirement benefits for men and women of the same age, seniority, and salary were equal. *Id.* Based on a study of mortality tables showing that women, on average, outlive men, the Department required its 2000 female employees to make monthly contributions to its pension fund that were 14.-84% higher than the contributions of its 10,-000 male employees. *Id.* at 705–07, 98 S.Ct. at 1374. The Department contended that the differential was not prohibited by Title VII because the value of the average female employee's pension benefit was greater than that of the average male employee. *Id.* The

---

tions or common law prohibiting employment discrimination based upon age, race, color, sex, religion, handicap or disability, national origin or any other protected category or characteristic, including but not limited to any and all claims arising under the Age Discrimination in Employment Act of 1967, ..., and/or under any other federal, state or local human rights, civil rights, or employment discrimination statute, rule or regulation.
App. at 1474.

12. An unopposed *amicus curiae* brief supporting SmithKline's motion for summary judgment on Count II has been filed by the Equal Employment Advisory Council ("EEAC"). Unopposed *amici curiae* briefs supporting Plaintiff's opposition to summary judgment on Count II have been filed by the American Association of Retired Persons ("AARP"), Action Alliance of Senior Citizens of Greater Philadelphia, Inc., and Legal Services for the Elderly of New York City.

Supreme Court rejected this argument, stating that "[e]ven a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply." *Id.* at 708, 98 S.Ct. at 1375. The Supreme Court concluded that

An employment practice that requires 2,000 individuals to contribute more money into a fund than 10,000 other employees simply because each of them is a woman, rather than a man, is in direct conflict with both the language and the policy of [Title VII]. Such a practice does not pass the simple test of whether the evidence shows treatment of a person in a manner which but for that person's sex would be different.

*Id.* at 711, 98 S.Ct. at 1377 (internal quotation omitted). Similarly, an employment practice that requires older individuals to release more rights than younger workers simply because each of them is at least age forty, rather than below age forty, is in direct conflict with both the language and the policy of ADEA. Such a practice does not pass the simple test of whether the evidence shows treatment of a person in a manner which but for that person's age would be different.

SmithKline argues that it is incorrect to assume that an older employee gives up more than a younger employee because the older employee may not have a viable age discrimination claim. This argument is completely inapposite because SmithKline does not limit enhanced benefits solely to those employees willing to release all *viable* claims. Instead, SmithKline extends enhanced benefits to any employee willing to sign the release, regardless of whether the employee has viable claims. Additionally, all employees age forty and above are protected by

ADEA, and therefore have *potential* age discrimination claims. Some older workers may have meritorious claims, while others may have no valid basis for claiming age discrimination. But SmithKline's policy exchanges valuable consideration for the release of *all* potential claims, meritorious and meritless. Viability is immaterial, therefore, because SmithKline does not limit enhanced benefits solely to employees who release viable claims. Rather, the Plan targets the right to make claims, and explicitly discriminates because older workers only receive the benefit enhancement if they waive potential claims that younger workers simply cannot have.[13]

Concluding that SmithKline's policy facially discriminates, however, does not end the inquiry, because ADEA permits a limited category of employment practices that explicitly discriminate based upon age. *See* § 623(f); *see also Hazen,* —— U.S. at ——, 113 S.Ct. at 1709 (stating that "ADEA is not an unqualified prohibition on the use of age in employment decisions"). Specifically, the statute states that "[i]t shall not be unlawful for an employer ... to observe the terms of a bona fide employee benefit plan where, for each benefit or benefit package, the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker." § 623(f)(2)(B)(i). An employer may only invoke this statutory exception, however, where a reduction in employee benefits is justified by age-related costs. *See Older Workers Benefit Protection Act,* S.Rep. No. 263, 101st Cong., 2d Sess. 12 (1990) [hereinafter *Senate Report*], *reprinted in* 1990 U.S.C.C.A.N. 1509, 1517 (noting that limitation of § 623(f)(2) to benefit reductions

---

**13.** Because I conclude that SmithKline's enhanced separation benefit policy constitutes disparate treatment, I need not determine whether the policy also constitutes disparate impact. To establish a *prima facie* case of disparate impact, the plaintiff must show that the employer's facially neutral practice had a "significant discriminatory impact" on member's of the protected class. *See Massarsky v. General Motors Corp.,* 706 F.2d 111, 120 (3d Cir.) (internal quotation omitted), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). Disparate impact cases typically focus on statistical disparities between members of the protected and unprotected

classes. *See, e.g., Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 987, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988). In this case, however, no statistics are necessary because *all* members of the age-protected class must surrender potential age discrimination claims, whereas *no* member of the non-protected class has potential age discrimination claims to surrender. Thus, a disparate impact analysis in this case involves arguments identical to those involved in the disparate treatment inquiry, and results in the same conclusion: SmithKline's policy causes a disparate impact because it specifies different treatment.

justified by age-related cost considerations is consistent with congressional intent).[14] Where the employee benefit involves no age-related costs, however, such as paid vacation and uninsured paid sick leave, the statutory exception does not apply. *See id.* at 18, 1990 U.S.C.C.A.N. at 1524. Similarly, § 623(f)(2) does not apply to lump-sum severance pay. *See id.* at 12, 1990 U.S.C.C.A.N. at 1517 (citing with approval *EEOC v. Borden's, Inc.,* 724 F.2d 1390 (9th Cir.1984), and *EEOC v. Westinghouse Elec. Corp.,* 725 F.2d 211 (3d Cir.1983), *cert. denied,* 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984)). Because SmithKline's enhanced separation benefits are distributed in the form of a lump-sum severance payment involving no age-related costs, § 623(f)(2) does not apply.

*Amicus* EEAC asserts on behalf of SmithKline that the Plan does not require older workers to give more than younger workers to receive enhanced benefits, but that even if it did, the principle underlying § 623(f)(2) supports a conclusion that the Plan does not violate ADEA. Specifically, EEAC argues:

> Like the increased cost of some benefits due to age, a particular employee's membership in the ADEA protected class is a fact of life over which the employer has no control. Congress did not require employers to pay *extra* life insurance premiums so that older workers could be insured for the same amount as younger workers. In the same manner, Congress did not require employers to pay extra consideration in order to obtain a valid ADEA waiver.

EEAC Br. Supp. M. Summ. J. at 26. EEAC's analogy is fundamentally flawed because it misconstrues the nature of the statutory exception and the enhanced benefit policy. Although an employer may *extend* unequal benefits that have equal age-related costs (e.g., life insurance), it may not *require* unequal consideration (e.g., waiving ADEA claims), in exchange for equal lump-sum severance payments. *Cf. Manhart,* 435 U.S. at 717, 98 S.Ct. at 1380 (noting that although it

is unlawful for an employer to require female employees to contribute more to a pension fund than male employees, it would not be unlawful for an employer to set aside equal retirement contributions for all employees, and to permit each retiree to purchase the largest benefit that his or her accumulated contributions could command in the open market). I therefore reject EEAC's assertion.

Having concluded that the separation benefit policy facially discriminates based on age, I now address three additional arguments SmithKline raises. None of these arguments, however, is persuasive.

1) Congress Rejected a Requirement of Additional Consideration for ADEA Waivers

EEAC argues that the enhanced benefit policy cannot violate ADEA because Congress considered, but rejected, a requirement that older workers receive additional consideration for a release of ADEA claims. EEAC's strained reading of congressional intent, however, has no foundation in the statute's legislative history.

In 1990, Congress enacted the Older Workers Benefit Protection Act ("OWBPA"), which amended ADEA expressly to permit "knowing and voluntary" waivers of age discrimination claims. 29 U.S.C.A. § 626(f)(1) (West Supp.1993). The amendment's legislative history indicates that Congress sought to permit waivers of rights under ADEA without EEOC supervision, but also wanted to protect older workers from being coerced into surrendering their rights. *See The Age Discrimination In Employment Waiver Protection Act of 1989,* S.Rep. No. 79, 101st Cong., 1st Sess. 3–17 (1989) (incorporated by reference in *Senate Report* at 15, 1990 U.S.C.C.A.N. at 1520). EEAC asserts that House and Senate bills introduced in 1989, but later reported out of committee, included provisions requiring additional consideration for valid waivers of ADEA claims. Because § 626(f)(1) does not include this requirement,

---

**14.** For example, an employer may provide lower life insurance coverage to an older worker than a younger worker where the cost to the employer for providing coverage to the older worker is equal to the cost for providing coverage to the younger worker. *See, e.g., Senate Report* at 19, 1990 U.S.C.C.A.N. at 1524.

EEAC argues, "it simply does not make sense that Congress would have considered it discriminatory not to offer such extra consideration in exchange for a waiver." EEAC Br. Supp. M. Summ. J. at 20. The primary flaw in EEAC's argument is that nothing in the legislative history of § 626(f)(1) suggests that Congress ever considered the issue of *discrimination*. Rather, the legislative history strongly suggests that Congress was primarily concerned with protecting employees from being bullied or coerced into surrendering potential age discrimination claims. *See Senate Report* at 32, 1990 U.S.C.C.A.N. at 1537 (noting that the Senate Committee on Labor and Human Resources specified minimum waiver requirements "with the intent of according basic due process protections to employees who are asked to execute waivers"). Further, the legislative history addresses the *specific* issue of ADEA waivers. Nothing in the legislative history gives any indication, however, that Congress ever considered, let alone decided, whether a *general* waiver of all claims discriminates against older workers.

### 2) Judicial Approval of General Releases

SmithKline argues that courts have upheld the validity of executed releases similar to the one used by SmithKline, and therefore SmithKline's release does not violate ADEA. For support, SmithKline cites *Cirillo v. Arco Chem. Co.*, 862 F.2d 448 (3d Cir.1988), in which the Court of Appeals reviewed the "totality of circumstances," and concluded that the plaintiff in that case executed a knowing and willful, and therefore enforceable release. SmithKline raised virtually the same argument, which I very clearly rejected, in its motion to dismiss. *See DiBiase v. SmithKline Beecham Corp.*, 834 F.Supp. 143, 146 n. 4 (E.D.Pa.1993). Nevertheless, SmithKline resurrects its argument, but adds that

> Although *Cirillo* involved the validity of an executed release, certainly if the employer there had violated ADEA by failing to provide *extra* consideration to the plain-

tiff above the enhancement offered to "younger" employees, this would have rendered the release void. That the Third Circuit nevertheless upheld the release at least implicitly demonstrates that the consideration package provided by the employer (which did not include a special enhancement for the waiver of ADEA rights) complied with ADEA.

Def.'s Mot. Summ. J. at 33–34. The fundamental flaw in this argument (and the reason I rejected virtually the same argument in SmithKline's motion to dismiss) is that the Court of Appeals was not confronted in *Cirillo* with the same issue that Plaintiff presents here. I decline SmithKline's invitation to speculate whether the Court of Appeals even considered an issue that was never directly addressed. As I stated in my previous opinion, *Cirillo* does not control whether SmithKline's separation benefit plan violates ADEA.

### 3) Public Policy Arguments

SmithKline argues that practical considerations support a conclusion that SmithKline's separation benefit policy does not violate ADEA. Primarily, SmithKline forecasts a "parade of horribles," in which employers will no longer be able to offer a single enhanced separation benefit package to all employees. Rather, SmithKline asserts, employers forced to offer special enhancements to employees in uniquely protected categories such as age and disability will soon cease to offer any enhanced separation benefits. For several reasons, SmithKline's ominous foreboding is unpersuasive.

First, SmithKline has only identified two unique categories—age and disability—within which only certain employees are protected.[15] This hardly constitutes the unwieldy administrative nightmare that SmithKline portends.

Second, SmithKline's assertion that employers will be unable to account for their employees' protected traits is somewhat disingenuous, particularly in this case, where SmithKline constructed an "Adverse Impact

---

**15.** At oral argument, SmithKline asserted that because some municipalities prohibit employment discrimination based on sexual orientation, only individuals with a sexual orientation are

protected by such laws. Contrary to SmithKline's assertion, all individuals have a sexual orientation, and therefore all individuals are protected by such laws.

Analysis" detailing the age, race, and gender of employees targeted for workforce reduction. *See* App. at 1422. Moreover, Smith-Kline apparently already accounts for an employee's disability status to ensure that the company does not treat persons with disabilities less favorably than persons without disabilities. *See* Barber Dep. at 108. Obviously this administrative burden must not be too onerous, or else SmithKline would not already bear it.

Third, I have difficulty believing that the widespread industry practice of offering enhanced benefits in exchange for a release of potential claims is so fragile that a decision requiring additional consideration for a valid release of ADEA claims will cause the practice to expire. This industry practice most likely entails a cost-benefit tradeoff, whereby an employer determines that paying enhanced benefits to all employees willing to waive potential claims is less costly than securing no waivers and litigating individual discrimination lawsuits. SmithKline may now add two additional factors into this calculation—the additional cost to secure ADEA waivers, compared with the additional litigation expense incurred by securing a release of all potential claims except those arising under ADEA.

Fourth, my conclusion would not differ even if SmithKline had articulated stronger public policy arguments opposing a requirement that employers offer additional consideration for a release of ADEA rights, because the statute signifies a clear congressional intent that distinctions based on age in the terms, conditions, and privileges of employment are impermissible. *Cf. Manhart*, 435 U.S. at 709, 98 S.Ct. at 1375–76 (stating that "the question of fairness to various classes affected by [Title VII] is essentially a matter of policy for the legislature to address").

Because SmithKline has not demonstrated that, as a matter of law, the Plan does not violate ADEA, I deny SmithKline's motion for summary judgment on Count II.

An appropriate order follows.

*ORDER*

AND NOW, this 15th day of March 1994, it is hereby ORDERED that SmithKline's motion for partial summary judgment (Document No. 20) is GRANTED as to Count I and DENIED as to Count II of Plaintiff's amended complaint (Document No. 5).