

Opinions of the United
States Court of Appeals
for the Third Circuit

2-16-1995

# DiBiase v SmithKline

Precedential or Non-Precedential:

Docket 94-1530

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"DiBiase v SmithKline" (1995). *1995 Decisions.* Paper 54.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/54

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 94-1530

———————————

JOHN DiBIASE

v.

SMITHKLINE BEECHAM CORPORATION

Appellant

———————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 93-cv-3171

———————————

Argued December 15, 1994

BEFORE:  BECKER, GREENBERG, and McKEE, Circuit Judges

(Filed: February 16, l995)

———————————

Richard A. Ash (argued)
Lyman & Ash
1612 Latimer Street
Philadelphia, PA  19103

Attorneys for Appellee

Alan D. Berkowitz
Steven B. Feirson (argued)
Dechert Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA  19103

Attorneys for Appellant

Thomas J. Bender, Jr.
Kristine Grady Derewicz
Buchanan Ingersoll, P.C.
1200 Two Logan Square

18th and Arch Streets
Philadelphia, PA  19103

Attorneys for Amicus
Curiae The Pennsylvania
Chamber of Business and
Industry

Stephen A. Bokat
Robin S. Conrad
National Chamber Litigation
Center, Inc.
1615 H Street N.W.
Washington, DC  20062

Attorneys for Amicus
Curiae Chamber of
Commerce of the United
States

Robert E. Williams
Douglas S. McDowell
Ann Elizabeth Reesman
McGuiness & Williams
1015 Fifteenth St. N.W.
Suite 1200
Washington, DC  20005

Attorneys for Amicus
Curiae Equal Employment
Advisory Council

L. Steven Platt
Arnold & Kadjan
19 West Jackson Boulevard
Chicago, IL  60604

Cathy Ventrell-Monsees
601 E Street N.W.
Washington, DC  20049

Paul H. Tobias
Tobias, Kraus & Torchia
911 Mercantile Library Bldg
414 Walnut Street
Cincinnati, OH  45202

Janette Johnson
3614 Fairmont Street
Suite 100
Dallas, TX  75219

<u>Attorneys for Amicus</u>
<u>Curiae The National</u>
Employment Lawyers
Association

---

**OPINION OF THE COURT**

---

GREENBERG, Circuit Judge.

This is an appeal from a district court's judgment predicated on its opinion holding that an employer violates the Age Discrimination in Employment Act ("ADEA") by offering to all employees terminated as a result of a reduction-in-force (RIF) enhanced severance benefits in return for a general release of all claims, including ADEA claims, against the employer.  We conclude that such a practice does not violate the ADEA, and therefore we will reverse the judgment of the district court. Because there is no basis for further proceedings in this case, we will remand the matter to the district court with instructions to enter judgment for the defendant.

**I.  INTRODUCTION, FACTUAL BACKGROUND, AND PROCEDURAL HISTORY**

The germane facts are not disputed.[1]  In 1990, the employer, defendant SmithKline Beecham Corporation (SmithKline), a Philadelphia-based pharmaceutical company, consolidated four computer data centers it operated throughout Pennsylvania and in Tennessee into a single center at King of Prussia, Pennsylvania. Prior to the consolidation, SmithKline employed plaintiff John DiBiase as a first-shift supervisor of computer operators at its Philadelphia data center.  With the consolidation, he moved to King of Prussia, where six supervisors remained employed, working two per shift, with each pair overseeing three to five computer operators.  Between late 1991 and early 1992, SmithKline decided to reduce the staff of this division, and it assessed the concomitant consequences.  Specifically, the data center's personnel manager "prepared an 'adverse impact analysis' examining the gender, race, and age of the shift supervisors to determine if any adverse impact would result from the planned reduction in staff." DiBiase, 847 F. Supp. at 343.  On February 1, 1992, SmithKline decided to lay off DiBiase and one other shift supervisor and it informed DiBiase of this decision the next day.  At that time, he was 51 years old.

SmithKline offered employees terminated in a RIF a separation benefit plan, which provided a lump sum payment based on the employee's length of service, as well as continued health

[1].  Unless otherwise noted, we take the facts from the district court opinion.  DiBiase v. SmithKline Beecham Corp., 847 F. Supp. 341 (E.D. Pa. 1994).

and dental benefits.  Specifically, the basic plan provided 12 months salary and three months continued benefits.  Additionally, the plan offered enhanced benefits to employees willing to sign a general release of all claims against SmithKline.  Terminated employees who signed the release were entitled to receive 15 months salary and six months continued health and dental coverage.  The release is in large part the subject of this appeal, and it stated in pertinent part:

> In consideration of the monies and other consideration to be received by me under the SmithKline Beecham Separation Program, I hereby irrevocably and unconditionally release, waive and forever discharge SmithKline Beecham Corporation, its affiliates, parents, successors, predecessors, subsidiaries, assigns, directors, officers, employees, representatives, agents, and attorneys . . . from any and all claims, agreements, causes of action, demands, or liabilities of any nature whatsoever . . . arising, occurring or existing at any time prior to the signing of this General Release, whether known or unknown.

General release § 1 at app. 98.  The release provided that employees who sign it waive

> [a]ny and all claims arising under federal, state, or local constitutions, laws, rules or regulations or common law prohibiting employment discrimination based upon age, race, color, sex, religion, handicap or disability, national origin or any other protected category or characteristic, including but not limited to any and all claims arising under the Age Discrimination in Employment Act of 1967, as amended, the Civil Rights Act of 1964, the Civil Rights Acts of 1866 or 1871, the National Labor

Relations Act and/or under any other federal, state or local human rights, civil rights, or employment discrimination statute, rule or regulation.

Release § 1 ¶2 at app. 98. Prefatory language to the release cautioned employees that "YOU SHOULD THOROUGHLY REVIEW AND UNDERSTAND THE TERMS, CONDITIONS AND EFFECT OF THE SEPARATION PROGRAM AND OF THIS GENERAL RELEASE. THEREFORE, PLEASE CONSIDER IT FOR AT LEAST TWENTY-ONE (21) DAYS BEFORE SIGNING IT. YOU ARE ADVISED TO CONSULT WITH AN ATTORNEY BEFORE YOU SIGN THIS GENERAL RELEASE." Release at app. 98. Under the terms of the release, employees were given seven calendar days after signing to revoke their signature. Release at app. 99.

DiBiase declined to sign the release. Instead, on April 29, 1992, he wrote a letter to William Mossett, SmithKline's personnel director, contending that SmithKline's policy violated the ADEA. The letter reads in pertinent part:

So there can be no possible misunderstanding I am stating my position as follows.

* * *

As stated in my grievance I have reason to believe that the company violated federal and state age discrimination laws in terminating me. I am declining the enhanced separation benefit package because I do not wish to give up my rights under these discrimination laws. I believe that the company's policy of requiring persons over forty to release age discrimination claims against the company in order to secure enhanced separation benefits violates these age discrimination laws since persons under forty may elect to receive enhanced separation benefits determined by the same

> formula that applies to persons over forty
> without releasing potential age
> discrimination claims.

Letter from DiBiase to Mossett of April 29, 1992, at app. 106, 107.  Because DiBiase did not sign the release, SmithKline refused to give him the enhanced benefits.  See Letter from Tyrone Barber, SmithKline's Personnel Manager, to DiBiase of May 4, 1992, at app. 108.  Still, DiBiase received the benefits due him under SmithKline's basic plan. Id.

On July 2, 1992, DiBiase filed an affidavit and charge with the Equal Employment Opportunity Commission (EEOC) alleging both that SmithKline terminated his employment because of his age, and that SmithKline's separation plan violated the ADEA because it treated older workers differently than younger workers by requiring them to release ADEA claims.  DiBiase EEOC aff. at app. 109-110.  On March 31, 1993, the EEOC determined that "there is not reasonable cause to believe that there has been a violation of the statute under which the charge has been filed." EEOC Determination at app. 67-68.

On June 14, 1993, DiBiase filed a complaint against SmithKline in the United States District Court for the Eastern District of Pennsylvania.  His amended complaint contained two counts.  Count 1 asserted that SmithKline fired him because of his age, in violation of the ADEA.  Complaint ¶ 15-19 at app. 55-56.  Count 2 alleged that SmithKline's "separation benefit plan violates ADEA because it discriminates against [him] and its

other employees forty or older by having higher requirements for them to qualify for the additional separation benefits than apply to its employees under forty."  Complaint ¶ 29 at app. 58. DiBiase also asserted that SmithKline's actions underlying both counts were willful and that he was entitled to punitive and double damages.  Complaint ¶¶  19, 31 at app. 56, 59.  On August 2, 1993, SmithKline moved to dismiss count 2 of the amended complaint, pursuant to Fed. R. Civ. P. 12(b)(6).  In a Memorandum opinion and order filed on September 29, 1993, the district court denied the motion.  The district court suggested that DiBiase might be able to show that even if SmithKline's plan was a "facially neutral employment" policy, it "had a significantly discriminatory impact."  Memorandum Op. at app. 47.

On December 20, 1993, SmithKline moved for summary judgment on both counts of DiBiase's complaint.  In an opinion and order dated March 15, 1994 -- entered the next day and reported at 847 F. Supp. 341 (E.D. Pa. 1994) -- the district court granted the motion as to Count 1 and denied it as to Count 2.  Specifically, the district court found that "no jury reasonably could conclude from the facts" that DiBiase had been replaced in his job.  847 F. Supp. at 346.  Inasmuch as DiBiase had not been replaced, the court concluded that he had failed to establish a prima facie case of wrongful termination under the

ADEA.  Thus, the district court granted summary judgment to SmithKline on the termination count, count 1.[2]

However, the district court denied SmithKline's motion for summary judgment on count 2.  Specifically, the court found that the separation plan involved discriminatory treatment of older persons.  Relying on the ADEA section providing a cause of action only for persons at least 40 years old, see 29 U.S.C. § 631(a), the district court observed that "[i]n order for an older employee to receive the same enhanced benefit as a younger employee, the older employee must release her right to file an ADEA claim."  DiBiase, 847 F. Supp. at 347.  The court further observed that "[t]his treatment is patently different because the younger employee cannot have an ADEA claim."  Id.  From these observations, the district court concluded that "SmithKline's policy facially discriminates" against employees protected by the ADEA.  Id. at 348.  Thus, the court denied SmithKline's motion.

---

[2].  Ordinarily, when employment is terminated as part of a RIF, the plaintiff need not prove that he or she was replaced by a worker outside the protected class.  Rather, to demonstrate a prima facie case "[i]n RIF cases, the plaintiff must show he was in the protected class, he was qualified, he was laid off and other unprotected workers were retained."  Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994).  Here, the district court found that "[p]laintiff cannot make such a showing, however, because all three retained employees . . . were within the protected class when plaintiff was terminated."  DiBiase, 847 F. Supp. at 345 n.5.  Thus, the district court used the standard for establishing a prima facie case in the typical age discrimination case.  We need not address whether the district court appropriately departed from traditional RIF analysis, because DiBiase has not appealed from the summary judgment on count 1.

On April 26, 1994, DiBiase made a cross-motion for summary judgment on count 2 of the amended complaint, based entirely on the district court's reasoning in its March 15, 1994 opinion.[3] On May 3, 1994, the district court granted this motion, "[f]or the reasons fully set forth in my March 15, 1994 Opinion." May 3, 1994 Order at n.1. Because the parties had stipulated to damages under count 2, the district court entered judgment for DiBiase in the amount of $14,203.03. Id. [4]

Meanwhile, on December 16, 1993, DiBiase had filed another action alleging that SmithKline had retaliated against him for pursuing his rights under the ADEA. On December 22, 1993, the district court consolidated the two actions. The parties settled the retaliation claim, and on April 29, 1994, the district court signed a stipulation and order (entered on May 2, 1994) dismissing that claim with prejudice. Thus, the May 3, 1994 order granting DiBiase's motion for summary judgment on count 2 concluded the proceedings before the district court. SmithKline timely filed a notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291 and the district court had subject matter jurisdiction pursuant to 29 U.S.C. § 626(c) and 28 U.S.C. § 1331.

---

[3]. Technically this motion was not a cross-motion, since it was made after the district court's order on the original motion. Nonetheless, the district court, the parties and the docket sheet describe it as a "cross-motion" and we follow suit.

[4]. It is unclear how the parties arrived at this figure.

We exercise plenary review over the district court's grant of summary judgment, Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir.), cert. denied, 114 S.Ct. 554 (1993), and, because the facts are undisputed, we decide the appeal as a matter of law.

## II.  DISCUSSION

### A.  Introduction

This case involves the scope of liability under the ADEA, a federal anti-discrimination statute that renders it unlawful for an employer:

> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
>
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

29 U.S.C. § 623(a).[5]  With these provisions, "[t]he ADEA 'broadly prohibits arbitrary discrimination in the workplace based on age.'"  Trans World Airlines, Inc. v. Thurston, 469 U.S. 111,

---

[5].  We generally rely on both ADEA cases and cases arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., because "Title VII and the ADEA have been given parallel constructions due to their similarities in purpose and structure."  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 n.4 (3d Cir. 1994).

120, 105 S.Ct. 613, 621 (1985) (quoting Lorillard v. Pons, 434 U.S. 575, 577, 98 S.Ct. 866, 868 (1978)).[6]  In a "privilege of employment" case such as this one, it is irrelevant that SmithKline had no obligation to provide the particular benefit to its employees, for once an employer decides to grant an opportunity to some, "it may not deny this opportunity to others because of their age."  Thurston, 469 U.S. at 121, 105 S.Ct. at 621.  As the Supreme Court has explained, "'[a] benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free . . . not to provide the benefit at all.'"  Id. (alteration in original) (quoting Hishon v. King & Spalding, 467 U.S. 69, 75, 104 S.Ct. 2229, 2233–34 (1984)).

SmithKline argues in the first instance that Congress, in enacting the Older Workers Benefit Protection Act, Pub. L. No. 101–43, 104 Stat. 978 (1990) (OWBPA), explicitly considered and rejected a provision entitling older workers to extra consideration for release of ADEA claims.[7]  The OWBPA set forth,

---

[6].  As noted above, however, the statute provides that "[t]he prohibitions in this chapter shall be limited to individuals who are at least 40 years of age."  29 U.S.C. § 631(a).

[7].  Somewhat inexplicably, at oral argument DiBiase vigorously denied that his theory of the case required employers to provide extra consideration to older workers signing general releases. To the contrary, he said that a provision for extra consideration would violate the ADEA as well and that the only way in which older people would be treated the same as younger people would be to allow older people to sign a release agreeing to waive all claims except those under the ADEA.

among other things, specific standards governing whether an employee's waiver of ADEA claims is valid.  <u>See</u> 29 U.S.C. § 626(f).  SmithKline points out that early drafts of the OWBPA provided that a waiver of ADEA claims is valid only when:

> the rights or claims are waived in exchange for consideration in addition to anything of value --
>
> > (ii) that has been offered to a group or class of individuals under an early retirement incentive or other employment termination program.

<u>See</u> 135 Cong. Rec. § 289-01, § 356-57 (introduction of bill in Senate); 135 Cong. Rec. H 696-03, H 697 (introduction of bill in House of Representatives).  SmithKline is correct in noting that

(..continued)

However, this case has proceeded on the assumption that DiBiase was claiming extra consideration.  In ruling on SmithKline's motion to dismiss, the district court stated that DiBiase "argues that an employer could secure a release of ADEA claims by offering additional consideration beyond that offered for a release of all claims except ADEA claims."  Memorandum of September 27, 1993, at app. 47.  Similarly, the district court commented in its opinion that "I have difficulty believing that the widespread industry practice of offering enhanced benefits in exchange for a release of potential claims is so fragile that a decision requiring additional consideration for a valid release of ADEA claims will cause the practice to expire."  <u>DiBiase</u>, 847 F. Supp. at 351.  In short, the district court certainly believed that DiBiase was asking for extra consideration.

At any rate, unless DiBiase is arguing that an employer never could secure a valid general release from a terminated employee protected by the ADEA, we perceive no analytical distinction between a claim for extra consideration and a claim that DiBiase should have been allowed to waive all claims except ADEA claims in exchange for the enhanced benefits.  Both arguments seek special treatment.  In the former situation, the older worker receives extra money.  In the latter situation, the older employee preserves his or her ADEA claims.

Congress did not include the provision in the OWBPA.  This history supporting SmithKline's position is significant and is entitled to some weight.  See United States v. Alcan Aluminum Corp., 964 F.2d 252, 264-65 (3d Cir. 1992).  However, we do not rely primarily on legislative history in resolving this case because, as the following discussion shows, it is evident that even if we disregard the history we must conclude that SmithKline's policy did not violate the substantive provisions of the ADEA.

With this said, we now assess whether SmithKline's policy of providing enhanced benefits only to terminated employees signing the release violated the ADEA.  A policy can be discriminatory because of its treatment of or impact on employees.  In a disparate treatment case "'[t]he employer simply treats some people less favorably than others because of their race, color, religion [or other protected characteristics].'" Hazen Paper Co. v. Biggins, ____ U.S. ____, ____, 113 S.Ct. 1701, 1705 (1993) (first alteration added) (quoting Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1855 n.15 (1977)). On the other hand, disparate impact liability "'involve[s] employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'"  Id. (quoting Teamsters, 431 U.S. at 335 n.15, 97 S.Ct. at 1855 n.15).

DiBiase contends -- and the district court found -- that older workers who signed SmithKline's release gave up more claims than younger workers who signed the release, since older workers, unlike younger workers, are protected by the ADEA. Because the argument is framed to contend that SmithKline treated older persons less favorably than younger persons, this articulation of the claim falls under the rubric of "disparate treatment."

## B.  Disparate treatment

As the Supreme Court has noted, "'[d]isparate treatment . . . is the most easily understood type of discrimination.'" Hazen, ____ U.S. at ____, 113 S.Ct. at 1705 (alteration added) (quoting Teamsters, 431 U.S. at 335 n.15, 97 S.Ct. at 1855 n.15). A successful disparate treatment case prevents an employer from intentionally engaging in discrimination or grants a remedy against it for such conduct. Thus, "[d]isparate treatment . . . captures the essence of what Congress sought to prohibit in the ADEA." Id. at ___, 113 S.Ct. at 1706. For example, as the Supreme Court pointed out when considering an employment termination case, "[i]t is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age." Id. In a disparate treatment case, the trier of fact asks not whether the employer's otherwise nondiscriminatory policy has some

adverse effect on members of the protected class, but rather, "is 'the employer . . . treating "some people less favorably than others <u>because</u> of their [age]."'" <u>U.S. Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482 (1983) (emphasis added) (quoting <u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949 (1978) (second internal quotation omitted)). Usually, disparate treatment involves an ad-hoc decision to treat an individual adversely because he or she is in a particular protected class. For example, in <u>Anderson v. City of Bessemer City</u>, 470 U.S. 578, 105 S.Ct. 1504 (1985), the district court found disparate treatment liability based on sex when a city refused to hire a qualified woman for the position of recreation director. <u>Id.</u> at 580, 105 S.Ct. at 1515. "Whatever the employer's decision-making process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." <u>Id.</u> at ____, 113 S.Ct. at 1706. Nonetheless, the district court found, and DiBiase argues, that he did not have to meet this test, because the policy constitutes explicit facial discrimination.

We agree that when a policy facially discriminates on the basis of the protected trait, in certain circumstances it "may constitute <u>per se</u> or explicit [age] discrimination." <u>EEOC v. Elgin Teachers Ass'n</u>, 780 F. Supp. 1195, 1197 (N.D. Ill. 1991). And, "[w]hether an employment practice involves disparate

treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."  Int'l Union, UAW v. Johnson Controls, Inc., 499 U.S. 187, 199, 111 S.Ct. 1196, 1204 (1991). This is because, in a facial disparate treatment case, the protected trait by definition plays a role in the decision-making process, inasmuch as the policy explicitly classifies people on that basis.  Thus, when the policy itself displays the unlawful categorization, the employee is relieved from independently proving intent.  See Hazen, ____ U.S. at ____, 113 S.Ct. at 1705 (while "'proof of discriminatory motive is critical, . . . it can in some situations be inferred from the mere fact of differences in treatment. . . .'") (citation omitted).

        The district court based its conclusion that the policy constitutes facial discrimination on the following reasoning. The ADEA provides a cause of action only to persons age 40 or older.  By its terms, then, the ADEA differentiates employees on the basis of age, and leaves younger workers unprotected by the statute.[8]  Thus, on their 40th birthday, workers gain a substantive, valuable right.  By contrast, nearly all other judicially enforceable rights apply to all persons, not to

---

[8].  As one court has noted, "[t]he House Report for [the ADEA] cited the example of airline stewardesses, who must apparently 'retire' by the age of 32, as people beset by an obvious age discrimination problem, yet who will have no remedy under the [ADEA]."  Kodish v. United Airlines, Inc., 463 F. Supp. 1245, 1249 (D. Colo. 1979), aff'd, 628 F.2d 1301 (10th Cir. 1980).

persons whose immutable characteristic falls in a particular category.  For example, Title VII of the Civil Rights Act of 1964 protects not just black workers, but whites as well.  Males as well as females may bring successful gender-discrimination suits.  And, in states with statutes prohibiting discrimination on the basis of sexual orientation, presumably heterosexuals are protected as well as homosexuals.  The district court next reasoned that, because the ADEA does not protect younger workers, while these other rights apply to all, older workers by definition hold a total number of rights greater than the total number of rights younger workers hold.  Hence, if younger workers hold rights with the total value of x, older workers have x + 1 rights.  In light of this analysis, the court reasoned that older terminated workers have more accrued claims to give up than younger workers.  Thus, in order to comply with the ADEA, SmithKline should have given extra consideration to older workers because by signing the release they were giving up more claims than younger workers.  Accordingly, the court concluded that, by treating older workers the same as younger workers, SmithKline facially and explicitly discriminated on the basis of age.

        We reject the district court's reasoning and thus we hold that it erred in concluding that SmithKline's policy is facially discriminatory and therefore constitutes per se discrimination.  The touchstone of explicit facial discrimination is that the discrimination is apparent from the terms of the

policy itself. In Thurston, for example, an airline company's policy constituted facial discrimination independent of proof of intent because it allowed all disqualified pilots automatically to be transferred to the position of flight engineer except those disqualified on the basis of age. Thurston, 469 U.S. at 121, 105 S.Ct. at 622. In Johnson Controls, 499 U.S. at 197, 111 S.Ct. at 1202, the policy at issue violated Title VII because it "exclude[d] women with childbearing capacity from lead-exposed jobs and so create[d] a facial classification based on gender." Similarly, Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 98 S.Ct. 1370 (1978), prohibited a policy that facially "require[d] 2,000 individuals to contribute more money into a fund than 10,000 other employees simply because each of them [was] a woman, rather than a man." Id. at 711, 98 S.Ct. at 1377.

But SmithKline's policy does not fall within that limited category of cases. Its plan cannot be said to be discriminatory on its face, because the district court's conclusion that the plan is facially discriminatory required referencing a fact outside the policy -- namely the ADEA. Consider the district court's holding: "Because ADEA provides a cause of action for age discrimination only to persons age forty and above, the Plan explicitly treats older employees differently than younger employees." DiBiase, 847 F. Supp. at 347. But the word "explicitly" does not belong. It is impossible to examine SmithKline's policy and conclude that on its face it treats older

workers disparately.  There is a good reason for this -- the policy does not classify persons on the basis of age.  On the contrary, the plan offering is an archetypical example of a facially non-discriminatory policy.  SmithKline made the expanded package available to all persons willing to sign the release, regardless of age.  SmithKline did not require employees to waive only ADEA claims, but to waive all claims.  A facially non-discriminatory policy cannot be transformed into a facially discriminatory policy simply because of the existence of the ADEA.[9]

---

[9]. While our result is not dependent on this point, we observe that certain precedents suggest that the premise that only employees 40 or over have anything to surrender under the ADEA is wrong.  Thus, it has been held that employees under the age of 40 may bring retaliation claims under section 4(d) of the ADEA, see Anderson v. Phillips Petroleum Co., 722 F. Supp. 668, 671-72 (D. Kan. 1989).  Moreover, at least two courts have held that, despite the statutory provision to the contrary, workers under the age of 40 may have standing to sue for substantive age discrimination.  In Johnson v. Mayor and City Council of Baltimore, 515 F. Supp. 1287, 1301 (D.Md. 1981), rev'd on other grounds, 731 F.2d 209 (4th Cir. 1984), the court held that a 32-year old plaintiff had standing to challenge the company's early retirement policy because "[the standing] provision does no more than define the acts prohibited by the statute and would not deprive plaintiff . . . of standing in this case."  Id.  In Allen v. American Home Foods, Inc., 644 F. Supp. 1553, 1558 (N.D. Ind. 1986), the court held that employees under 40 had standing to sue under the ADEA when they were terminated in the wake of a plant closing.  Our point is not that these cases were decided correctly, a conclusion we neither reach nor reject.  Rather, our point is that the provisions of the ADEA -- and how they are interpreted -- are outside an employer's control.  Moreover, the 30-year old's suit certainly imposes costs upon the company, and once the suit is filed, it cannot be said that the costs will be contained by an early dismissal.  These facts make it even more difficult to make the blanket statement that older persons'

Thus, DiBiase is left with having to _prove_ both unequal treatment and intent to discriminate. _See_ _Hazen_, ____ U.S. at ____, 113 S.Ct. at 1705; _Armbruster v. Unisys Corp._, 32 F.3d 768, 782 (3d Cir. 1994); _Fuentes v. Perskie_, 32 F.3d 759, 764 (3d Cir. 1994). The Supreme Court plainly has stated that "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." _Hazen_, ____ U.S. at ____, 113 S.Ct. at 1705. Here, the record does not contain even the slightest evidence of discriminatory motive.[10]

At any rate, even assuming the existence of a

(..continued)
claims are worth more than younger persons' claims. _See_ _generally_ Typescript at 21-24.

[10]. In _Hazen_, the Supreme Court held that discrimination based on pension eligibility (when pension eligibility was based on years of service) does not violate the ADEA despite the strong correlation between the two categories. The Court did say, however, that "[w]e do not preclude the possibility that an employer who targets employees with a particular pension status on the assumption that these employees are likely to be older thereby engages in age discrimination. Pension status may be a proxy for age . . . in the sense that the employer may suppose a correlation between the two factors and act accordingly." _Hazen_, ___ U.S. at ____, 113 S.Ct. at 1707. Here, there is nothing in the record to indicate that SmithKline, by offering the general release, intended to target older workers. In fact, its motive is quite obvious -- it wanted to protect itself against all litigation arising out of the RIF.

DiBiase also contends that the intent to discriminate can be inferred based on his letter to SmithKline charging SmithKline with violating the ADEA. This is preposterous. The logical consequence of the argument is that a terminated employee can manufacture an illicit intent on the part of the employer simply by telling the employer that he or she thinks the employer is violating an anti-discrimination law.

legitimate factual dispute concerning SmithKline's motive, it simply did not discriminate against DiBiase on the basis of age. Again, we begin with the district court's reasoning. The district court properly concluded that employees gain a valuable substantive right simply by turning 40 for the ADEA protects workers who are at least 40 years of age from age discrimination. 29 U.S.C. § 631(a). But the district court went on to reason that all 40-year old employees had accrued ADEA "claims" that necessarily rendered their bundle of accrued claims more valuable than younger employees' bundles. Thus, the district court's reasoning assumes that all terminated employees with races or with genders have accrued potential Title VII claims against their former employers, and that terminated employees with sexual orientations have such potential claims under various relevant state laws. The court's reasoning also assumes that all such accrued claims are equally valuable. To take the principle where it logically leads, it is like saying every person has accrued a potential due process claim simply because he or she has been a person and hence has been protected by the Fifth and Fourteenth amendments.

This kind of reasoning is inappropriate because the ADEA claim was just one of a plethora of claims that SmithKline asked employees to waive. Thus, the value of the accrued ADEA claim has to be weighed against the value of other accrued claims. For instance, other things being equal, a terminated

employee's potential accrued gender discrimination claim probably would be worth more if the employee were a woman, even though both men and women are protected by Title VII.  Similarly, assuming all other variables to be equal, a black employee's race discrimination claim may be worth more in the abstract than such a claim from a white employee.  Recognizing these possibilities inevitably leads us away from the abstract reasoning utilized by the district court into a more practical approach that recognizes that the value of a bundle of accrued claims depends on a myriad of factors including, among other things, the employee's work performance history, the circumstances surrounding the terminations, and the nature -- if any -- of the rehiring.  For example, a 35-year-old black employee terminated despite a stellar work performance record certainly has a more valuable claim under Title VII than a 55-year-old, fired because of incompetence, has under the ADEA.  In theory, if there were a market for accrued claims, terminated 40-year old employees would not receive automatically the highest bids, as buyers would want to know more facts about the circumstances surrounding individual terminations.  The point, of course, is that the district court's assumption, that because of the ADEA all 40-year old employees have a more valuable set of claims than younger workers, is simply wrong.  One cannot say in the first instance that the 50-year-old's accrued "claims" are by definition worth more than others' accrued claims.

The fallacy in the district court's reasoning is in large part due to the conflation of the notion of a "right" with the notion of an accrued "claim." A right to be free prospectively from certain forms of discrimination always is worth something; however, whether a person has accrued a claim based on a right depends entirely on what previously has occurred. SmithKline did not ask its terminated employees to give up their statutorily or constitutionally created rights to be free prospectively of various forms of discrimination. Rather, the plan's focus was entirely retrospective, on whether the value of any claims -- by definition already accrued -- was worth surrendering for the enhanced benefits. The significance of the distinction between a right and a claim is particularly demonstrated in this case because the district court found that DiBiase's substantive age discrimination claim had no merit.

In fact, the district court's reasoning and conclusion are at odds with propositions of law it acknowledges in its opinion. The court correctly noted that the ADEA "focuses on individuals, and precludes treatment of individuals as simply components of an age-based class." DiBiase, 847 F. Supp. at 347. By analogy, in Manhart, the pension policy violated Title VII despite the fact that it was based on legitimate actuarial calculations, because "the basic policy of the statute requires that we focus on fairness to individuals rather than fairness to classes." Manhart, 435 U.S. at 709, 98 S.Ct. at 1376. This is

because "[p]ractices that classify employees in terms of religion, race, or sex [or age] tend to preserve traditional assumptions about groups rather than thoughtful scrutiny of individuals." Id. Yet the district court's reasoning turns this principle on its head. Here, SmithKline enacted a policy that called for each individual to weigh the circumstances surrounding his or her discharge, and to make an informed decision about whether to sign the release or proceed with claims that, if they existed, already had accrued. Thus, the policy certainly was fair to individuals. Yet, the district court's opinion, by conflating prospective rights with accrued claims, ignored the variances in each individual's situation, and instead classified all persons who were at least 40 years old as being in the identical position. The opinion thus reached a conclusion directly contrary to the policy it correctly enunciated.

We must emphasize that our result may have been different had there been no analytical distinction between the class of disadvantaged employees (assuming such a class) and the protected class -- that is, had older employees by definition given up more claims than younger employees. In this regard, Hazen again is instructive. Although the Court concluded that "age and years of service are analytically distinct," Hazen, ____ U.S. at ____, 113 S.Ct. at 1707, it expressly declined to "consider the special case where an employee is about to vest in pension benefits as a result of his age, rather than years of

service." Hazen, ___ U.S. at ____, 113 S.Ct. at 1707. The correlation between age and pension status in that special case is materially different -- the terminated employee always will be a member of the protected class. The point is important, because we would have faced a different situation if, for example, SmithKline conditioned the expanded separation package upon a waiver only of ADEA claims inasmuch as employees do in fact gain a substantive right when they turn 40. Thus, assuming no knowledge of the circumstances surrounding the termination, the possibility that a terminated older employee actually has a viable age discrimination claim, is worth something (though probably not much) in the abstract. It follows, then, that if SmithKline required terminated employees to give up only ADEA claims to obtain the enhanced benefits, older employees but not younger employees would be forced to give up something of value.[11]

In the foregoing scenario, SmithKline would have treated older workers differently than younger workers. Thus, in EEOC v. Westinghouse Electric Corp., 869 F.2d 696 (3d Cir. 1989), vacated and remanded, 493 U.S. 801, 110 S.Ct. 37 (1989), we held that a policy denying severance pay to laid-off employees who were eligible for early or selected retirement constituted discrimination on the basis of age. There, the class of people eligible for early retirement always coincided with members of

_____

[11]. But see footnote 9, supra.

the protected class.  Id. at 705.[12]  But that is not the situation here and we decline to address how we would rule in such a case.  SmithKline conditioned the right to the expanded benefits on an employee's blanket waiver of all accrued claims; this treatment cannot be said to be disparate, because it is impossible to tell whose package of potential claims is more valuable.[13]  Therefore, in light of the above, DiBiase has no disparate treatment claim against SmithKline.

---

[12].  The Supreme Court remanded Westinghouse for reconsideration in light of Public Employees Retirement System of Ohio v. Betts, 492 U.S. 158, 109 S.Ct. 1854 (1989).  In Betts, the Supreme Court held that the then-existing section 4(f)(2) of the ADEA -- exempting from the ADEA's prohibitions "any bona fide employee benefit plan . . . which is not a subterfuge to evade the purposes of the Act" -- insulates bona fide plans from the purview of the ADEA "so long as the plan is not a method of discriminating in other, non-fringe-benefit aspects of the employment relationship."  Id. at 177, 109 S.Ct. at 2866. Congress since overruled Betts.  We cite Westinghouse solely for the proposition that when a company's policy distinguishes employees on the basis of a factor analytically indistinct from age, we would be faced with a different situation than that in this case.

[13].  The National Employment Lawyers Association has filed an amicus brief relying in part on EEOC v. Board of Governors, 957 F.2d 424 (7th Cir.), cert. denied, ____ U.S. ____, 113 S.Ct. 299 (1992).  In that case, the Court of Appeals for the Seventh Circuit held that "a collective bargaining agreement provision that denies employees their contractual right to a grievance proceeding whenever the employee initiates a claim, including a claim of age-based discrimination, in an administrative or judicial forum", id. at 425, violates section 4(d) of the ADEA. Id. at 431.  Section 4(d) prohibits employers from retaliating against an employee "because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or litigation under this chapter."  29 U.S.C. § 623(d).  The company's policy therefore commanded a violation of this provision anytime an employee filed an age

## C. Disparate Impact

### 1. Whether DiBiase adequately has raised this issue

An amicus, the National Employment Lawyers Association (NELA), urges us to affirm the district court's judgment on the alternative theory of disparate impact. In a disparate impact case, the plaintiff claims that the employment practice "has a disproportionate effect on older workers [and thus] violates the ADEA." Hazen, ___ U.S. at ____, 113 S.Ct. at 1710 (Kennedy, J. concurring). While the district court indicated that it "need not determine whether the policy also constitutes disparate impact," DiBiase, 849 F. Supp. at 348 n.13, it nevertheless went on to say:

> Disparate impact cases typically focus on statistical disparities between members of the protected and unprotected classes. In this case, however, no statistics are necessary because all members of the age-protected class must surrender potential age discrimination claims, whereas no member of the non-protected class has potential age discrimination claims to surrender. Thus, a disparate impact analysis in this case involves arguments identical to those involved in the disparate treatment inquiry, and results in the same conclusion: SmithKline's policy causes a disparate impact because it specifies different treatment.

Id. (citation omitted; emphasis in original). The district court's observation about disparate impact assumes that older

(..continued)
discrimination charge with the EEOC. This decision does not support DiBiase's position.

workers signing the release gave up more than younger workers solely because the ADEA protects only older workers.  In light of our discussion above, that analysis is flawed fundamentally. Moreover, the district court's reasoning is somewhat circular -- in explaining why there is disparate impact liability, the court assumed the conclusion of its disparate treatment analysis.  That logical flaw makes the disparate impact analysis redundant: To say that there is disparate impact because there is disparate treatment is to say nothing at all.  Of course, if a policy is facially discriminatory, it has a disparate impact on the discriminated-against individuals.  Therefore, we reject the district court's disparate impact conclusion for the reasons detailed above.[14]

But the question remains -- should we still remand the matter for further proceedings (and perhaps further discovery) on a different type of disparate impact theory.  After all, to conduct a disparate impact analysis properly in this context, the court should have assumed that the release did not treat employees disparately, and then asked whether, in reality, the

---

[14]. The problem with the district court's analysis probably stems from the fact that the court explicitly indicated that it need not reach the issue of disparate impact.  See DiBiase, 849 F. Supp. at 348 n.13; Br. Amicus Curiae of National Employment Lawyers Association at 7 (acknowledging that district court determined that it need not decide whether the severance plan constitutes unlawful disparate impact).  The language following the district court's disclaimer constituted simply a reflection on the import of the court's disparate treatment conclusion -- once a policy is deemed facially discriminatory, the policy has a disparate impact as well.

policy had a disproportionate effect on older employees. Such an inquiry, of course, would have required use of sophisticated statistical data, and DiBiase apparently was not inclined to take this path, as he produced no such evidence.

DiBiase does not urge us to reach this conclusion as an alternative way to uphold the district court's judgment if we reject the court's disparate treatment analysis. Only the amicus argues that DiBiase's "ADEA claims are actionable under a disparate impact theory," NELA Br. at 7, but an "amicus may not frame the issues for appeal." Swan v. Peterson, 6 F.3d 1373, 1383 (9th Cir. 1993) (citing Sanchez-Trujillo v. I.N.S., 801 F.2d 1571, 1581 n.9 (9th Cir. 1986), cert. denied, ____ U.S. ____, ____ S.Ct. ____, 1004 U.S. LEXIS 7855 (1994). Absent the existence of "substantial public interests" calling us to depart from the general rule, "we consider only issues argued in the briefs filed by the parties and not those argued in the briefs filed by interested nonparties." Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co., Inc., 842 F.2d 977, 984 (8th Cir. 1988), cert. denied, 488 U.S. 821, 109 S.Ct. 66 (1988); Preservation Coalition, Inc. v. Pierce, 667 F.2d 851, 862 (9th Cir. 1982).[15] Therefore, because DiBiase is not pursuing a disparate impact claim, the issue is not before us.

---

[15]. SmithKline addresses disparate impact theory, apparently to protect itself lest we conclude that the district court adequately reached the issue.

## 2. The availability of disparate impact theory in this case[16]

We note, however, that even if the issue properly were before us, disparate impact theory would not be applicable here. In a factual scenario remarkably like the one here, the Supreme Court held that there can be no disparate impact liability. In Manhart, the City of Los Angeles argued that its pension policy requiring women to contribute greater amounts into a pension fund than men was mandated by Title VII itself, reasoning that "a gender-neutral pension plan would itself violate Title VII because of its disproportionately heavy impact on male employees." Manhart, 435 U.S. at 710 n.20, 98 S.Ct. 1370, 1376 n.20. The Court dismissed the argument out of hand: "Even under Title VII itself -- assuming disparate-impact analysis applies to fringe benefits -- the male employees would not prevail. Even a completely neutral practice will inevitably have some disproportionate impact on one group or another. . . . [T]his Court has never held . . . that discrimination must always be inferred from such consequences." Id. That case, like this one, involved an employer's grant of "fringe benefits." There, the city argued that it was required to treat people unequally in order to treat them equally. Here, DiBiase makes the identical argument -- that SmithKline was required to treat employees

---

[16]. Judge Becker does not join subsection II(C)(2) and II(C)(3) of the opinion. He would say simply that DiBiase clearly abjured any intention to proceed under a disparate impact theory, and therefore there is no disparate impact claim before us.

unequally in order to treat them equally.  Like in Manhart, the disparate treatment is alleged to be justified because older people as a group would otherwise pay more for the privilege than younger people.

Moreover, the facts of this case simply do not implicate the policies underlying disparate impact theory.  In the first place, as described in detail above, the policy does not per se affect older workers more harshly than younger workers.  Second, there is absolutely no evidence that the company's policy does in fact affect older people adversely. Third, even if it did, such a neutral policy -- which does not rely on an invidious stereotype about older employees, which clearly is not motivated by a discriminatory impulse, and which could be demonstrated to have a disparate impact only by the use of an incredibly sophisticated statistical analysis -- simply cannot be the basis of ADEA liability.  Fourth, this is not a case where finding liability would help eradicate the entrenched effects of past discrimination.  Finally, use of statistical evidence demonstrating a disproportionate impact will shed little light on the employer's motive.  In short, there can be no liability in this case based on disparate impact.

### 3.  Disparate impact theory under the ADEA[17]

---

[17].  Judge McKee does not join subsection II(C)(3) of the opinion, as he finds it unnecessary to consider the question of whether disparate impact theory liability is viable under the

Moreover, in the wake of Hazen, it is doubtful that traditional disparate impact theory is a viable theory of liability under the ADEA.  In Hazen, the Supreme Court stated that it was declining to decide whether an employer may be liable under the ADEA on a disparate impact theory.  Id. at ____, 113 S.Ct. at 1706, id. at ____, 113 S.Ct. at 1710 (Kennedy, J. concurring); Markham v. Geller, 451 U.S. 945, 101 S.Ct. 2028 (1981) (Rehnquist, J., dissenting from denial of certiorari).  Yet the analysis in Hazen casts considerable doubt on the viability of the theory.  And, in fact, we recently recognized that the existence of disparate impact theory under the ADEA is an open question.  See Armbruster, 32 F.3d at 772 n.4 ("Whether a disparate impact theory of liability is even available under ADEA has yet to be addressed by the Supreme Court.  In any event, because the district court has not yet addressed this issue, we think it would be inappropriate for us to consider it."). (Citations omitted).[18]

(..continued)
ADEA.  Therefore, Judge Greenberg writes this subsection only for himself.

[18].  In Massarsky v. General Motors Corp., 706 F.2d 111 (3d Cir.), cert. denied, 464 U.S. 937, 104 S.Ct. 348 (1983), we noted that "this court has never ruled on whether a plaintiff can establish a violation of the Act by showing disparate impact alone."  Id. at 120.  In MacNamara v. Korean Air Lines, 863 F.2d 1135 (3d Cir. 1988), cert. denied, 493 U.S. 944, 110 S.Ct. 349 (1989), however, we said that "Title VII and ADEA liability can be found where facially neutral employment practices have a discriminatory effect or 'disparate impact' on protected groups, without proof that the employer adopted these practices with a discriminatory motive."  Id. at 1148.  That case is not controlling, however.  First, there the plaintiffs challenged

Three premises in the <u>Hazen</u> Court's analysis make the point. First, though not explicitly deciding the viability of disparate impact liability under the ADEA, the Court did note that disparate treatment "captures the essence of what Congress sought to prohibit in the ADEA." <u>Hazen</u>, _____ U.S. at _____, 113 S.Ct. at 1706. Second, the Court reasoned that "Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." <u>Id.</u> Finally, the Court held that "[w]hen the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age . . . ." <u>Id.</u> In a pure disparate impact case, the employer's decision by definition is "wholly motivated by factors other than age."[19] Thus, with the third premise, the Supreme Court apparently concluded that in

(..continued)
"the practice of favoring Korean nationals on the ground that it has the <u>effect</u> of discriminating against others on grounds of race or national origin." <u>Id.</u> Thus, the disparate impact allegation involved Title VII only, and the statement about the ADEA is pure dicta. Second, the cases relied upon for the proposition were Title VII cases, and in light of our express statement in <u>Massarsky</u> that Title VII jurisprudence did not necessarily apply to the ADEA in this context, it is inconceivable that we simply would have applied disparate impact theory without analysis -- particularly when the application was not relevant to the decision. Third, we decided <u>MacNamara</u> before <u>Hazen</u>, and subsequent Supreme Court authority necessarily controls.

[19]. I am not concerned here with situations in which impact is used to prove intent to discriminate.

such cases, the policies behind the ADEA are not implicated. With that said, it is difficult to see how disparate impact liability can survive the analysis.

The Court of Appeals for the Seventh Circuit and two district courts, relying in part on Hazen, recently held that disparate impact liability is unavailable under the ADEA. EEOC v. Francis W. Parker School, 41 F.3d 1073, 1077 (7th Cir. 1994) ("decisions based on criteria which merely tend to affect workers over the age of forty more adversely than workers under forty are not prohibited") (citing Anderson v. Baxter Healthcare Corp., 13 F.3d 1120 (7th Cir. 1993)); Martincic v. Urban Redevelopment Authority of Pittsburgh, 844 F. Supp. 1073, 1076-77 (W.D. Pa. 1994) (holding that in light of Hazen, there can be no disparate impact liability under the ADEA), aff'd, No. 94-3235, ___ F.3d (3d Cir. Nov. 28, 1994) (table); Hiatt v. Union Pacific R.R. Co., 859 F. Supp. 1416, 1434 (D. Wyo. 1994) ("[I]t is inappropriate to incorporate the disparate impact theory of discrimination enumerated [by the Supreme Court in the Title VII context] into the ADEA.").[20]

---

[20]. Yet several courts of appeal have assumed that disparate impact liability applies under the ADEA. See, e.g., Geller v. Markham, 635 F.2d 1027, 1032 (2d Cir. 1980), cert. denied, 451 U.S. 945, 101 S.Ct. 2028 (1981); Abbott v. Federal Forge, Inc., 912 F.2d 867, 872 (6th Cir. 1990); Rose v. Wells Fargo & Co., 902 F.2d 1417, 1423-25 (9th Cir. 1990). These cases were decided before Hazen, and none of them even purported to conduct any analysis of the issue. Rather, they probably relied on the oft-cited principle that interpretations of the ADEA parallel interpretations of Title VII. Because Hazen, if nothing else at least disposes of that assumption, those cases are not persuasive. However, even after Hazen, the Court of Appeals for

The _Hazen_ Court's emphasis on the congressional purpose behind the ADEA is particularly helpful in confirming the Court's intimations.  First, the statutory language does not explicitly provide for disparate impact liability.  While it has been argued that section 623(a)(2) authorizes claims of disparate impact, _see_ Marla Ziegler, _Disparate Impact Analysis and the Age Discrimination in Employment Act_, 68 Minn. L. Rev. 1038, 1050-51 (1984), that reading of the statute is inaccurate.  The section renders it "unlawful for an employer ---

> (2) to limit, segregate, or classify his
> employees in any way which would deprive or
> tend to deprive any individual of employment
> opportunities or otherwise adversely affect
> his status as an employee, because of such
> individual's age . . . ."

29 U.S.C. § 623(a)(2).  However, finding the theory lurking in this section requires reading the language "because of such individual's age" to modify "adversely affect" rather than to modify "limit, segregate, or classify."  Because of the placement of the commas, this is a grammatically incorrect reading.  _See_ Pamela S. Krop, Note, _Age Discrimination and the Disparate Impact Doctrine_, 34 Stan. L. Rev. 837, 842-43 (1982).  Moreover, as Krop points out, section (2) parallels the language of section (1), which makes it unlawful for an employer --

> (1) to fail or refuse to hire or to discharge
> any individual or otherwise discriminate

(..continued)
the Eighth Circuit assumed -- again without analysis --  that disparate impact liability is cognizable under the ADEA.  _See_ _Houghton v. Sipco, Inc.,_ 38 F.3d 953, 958-59 (8th Cir. 1994).

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a).  "Under this provision, the 'because of such individual's age' clause can only modify the description of prohibited actions . . . . The parallel wording of section 4(a)(2) indicates that it too was aimed at disparate treatment. An employer may not limit, segregate, or classify employees on the basis of age in a manner that would adversely affect an employee."  Krop at 843.

More than that, however, although the ADEA language quoted above parallels the language in Title VII, when the Supreme Court found disparate impact liability under Title VII, it relied not on any specific statutory language but on the policies behind the statute.  In that case, Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849 (1971), the Court stated:

> The objective of Congress in the enactment of Title VII . . . was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees.  Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices.

Id. at 429-30, 91 S.Ct. at 853.  This policy is not easily transplanted into the ADEA, the primary purpose of which is to prohibit employers from acting upon the assumption that

"productivity and competence decline with old age."  Hazen, ____
U.S. at ____, 113 S.Ct. at 1706.  As one court has put it, "[i]n
Griggs, the critical fact was the link between the history of
educational discrimination and the use of that discrimination as
a means of presently disadvantaging African-Americans.  These
concerns simply are not present when the alleged disparate impact
is based on age."  Hiatt, 859 F. Supp. at 1436.  Congress itself
recognized this distinction, for it provided in the ADEA that
"[i]t shall not be unlawful for an employer . . . to take any
action otherwise prohibited [by this section] where the
differentiation is based on reasonable factors other than age . .
. ."  29 U.S.C. §623(f)(1).  "The sentence is incomprehensible
unless the prohibition forbids disparate treatment and the
exception authorized disparate impact."  Metz v. Transit Mix,
Inc., 828 F.2d 1202, 1220 (7th Cir. 1987) (Easterbrook, J.
dissenting) (quoting Douglas Laycock, Continuing Violations,
Disparate Impact in Compensation, and Other Title VII Issues, 49
L. & Contemp. Prob. 53, 55 (Aut. 1986) (referring to identical
language of Equal Pay Act).  In other words, by the statutory
language itself, Congress recognized that neutral policies not
motivated by discriminatory intent may be permissible employment
practices.  It is difficult to imagine how Congress could have
concluded otherwise -- for application of disparate impact theory
could lead to results which Congress probably did not intend.[21]

_____

[21].  For example, if an employer set the work week at five days
per week, eight hours per day, or if it determined to eliminate

But I need not go so far as to say that disparate impact theory is never available under the ADEA. Rather, resolution of that issue must await another day. I write this section to highlight my doubts and to say that, at any rate, disparate impact theory should not be applied as a matter of course. Here, of course, we only need hold that even if in some situations disparate impact liability may be established under the ADEA, this case does not present one of them.

### III. CONCLUSION

In view of the aforesaid, we hold that an employer may offer enhanced benefits to all terminated employees agreeing to waive all claims against the company, without providing extra consideration to workers protected by the ADEA. Thus, it is evident that the district court should have denied DiBiase's motion for summary judgment and should have granted SmithKline's motion for summary judgment on count 2 of the amended complaint. Furthermore, it is clear that there is no need for further proceedings in the district court. See Nazay v. Miller, 949 F.2d

(..continued)
medical insurance coverage, its decisions could have a disparate impact on older employees. In that circumstance, in an ADEA action employers would be forced to justify their business practices with older employees then having the opportunity to demonstrate that alternative employment practices could fulfill the employer's needs. See Abbott v. Federal Forge, Inc., 912 F.2d 867, 872 (6th Cir. 1990). Such a regime could subject employers to unreasonable intrusions by juries into their business practices. See Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992).

1323, 1328 (3d Cir. 1991).  Consequently, the order of May 3, 1994, granting DiBiase summary judgment will be reversed and the matter will be remanded to the district court for entry of judgment in favor of SmithKline.